Good morning. Jeanine D'Angelo for Petitioner Appellant, Gimenez. Gimenez was denied his constitutional right to a fair trial. The jury heard from 11 different medical experts. They never heard the most complete and compelling and probative and exculpatory evidence. In this case, this jury never heard the complete medical record. They never heard Dr. Ennis' deficiency diagnosis. This diagnosis explained why the child died, the medical basis for her death, that she was not killed at the hands of her father. Is there any evidence in the record that counsel was deficient in failing to come up with this theory at the time? It was, you mean the trial record, Your Honor? Well, any record. Is there any record, is there anything in the record that shows that counsel was not being reasonably competent by himself not thinking up the Ennis theory at the time of trial? I think, if you think cumulatively, that counsel did not know certain things that were going on with this child, symptoms that she had, which we now know could be answered by this diagnosis. Let me put it somewhat differently. Very frequently, if not nearly all the time, in a case such as this, there is a declaration in the record from some counsel which says, you know, this lawyer was really off base in not pursuing this line of inquiry. And there's nothing like that that I could find in this record, nor is there anything even to show in this record that this theory was a sound theory at the time of trial. Working backwards, the government has never rebutted the Ennis theory. The Ennis theory cannot be rebutted because it's based on and founded on the actual medical records which were provided to the district court. To back up his diagnosis, which takes into account each of the child's symptoms and backs them up from the record itself. Well, not quite. I mean, it doesn't fully allow for several of the things that happen and that were in front of the trial court. It answers symptoms which were unanswered by the shaken baby theory. It answers ‑‑ it shows a mucosal hemorrhage found in autopsy which supports the Ennis diagnosis, has nothing to do with shaken baby. It explains the unexplained anemia. It explains and shows the coagulopathy. There are words contained and they were provided to the court in support of this. You don't even need to analyze the data, the blood labs which were not seen by anyone, not the prosecution's experts, not the defense experts. The prosecution's experts reached their opinion without having this important medical data in front of them. And the words severe coagulopathy appear in the record. This doesn't take a diagnosis. This takes looking at the words. Physicians examining this child at Children's Hospital found severe coagulopathy. And yet each side said at trial, yes, this can be a cause of the type of bleeding that killed this child. Yet neither one of them knew of this evidence. Now, I don't think that Turner, the defense attorney, even needed to possibly put forward the Ennis diagnosis. He could have simply looked at the record and seen coagulopathy and said, when his expert and their expert were testifying, what do you say about this? This is a cause. But his experts didn't tell him that. Was he supposed to just divine it? I believe if he had seen just the sheer numbers of pages, which I know is somewhat of a fallback argument, but 65 versus 363. He was provided by the district attorney, 65 pages from Children's Hospital. There were in fact 363 pages. And those were the pages that held all that medical information. If the child had a spinal tap, if the child had two spinal taps, we know that there are lab records supporting that. Where were they? His experts didn't even have the basics to tell why the anemia was there. They had scant medical records to go on. Remember Dr. Tisnotto, that was his main key medical expert, didn't have the CAT scans. He had asked for those. How foolish. He must have felt in front of the jury not even having the CAT scans. Now, I think your question was, how do we know that he should have known these things? We don't know what Turner had. Whatever he had, he certainly wasn't using it. Back to the Dr. Lewis report, this held epilepsy, showed a liver dysfunction, showed blood in the spinal tap. If you get blood in the spinal tap, you know there's got to be labs for that. What did he do? He didn't ask for any labs. He didn't look. He declared under penalty of perjury that he had epilepsy. The jury reached their decision without the complete medical record. They heard the prosecution again and again, the mantra, shaken baby, shaken baby, and fine, the prosecution reached this without the whole medical record. There is no foundation then for their opinion. If you read Dr. Innis's report, it's in the medical record. It's there. Is this me, and I've only gone three? Oh, excuse me. Yeah. You've still got some time left. Mr. Viena. May it please the Court, good morning. I'm Kevin Viena, Deputy Attorney General for Respondent Epele. Although we believe and continue to maintain that issues are unexhausted, that the Innis information is unexhausted because those operative facts were never presented to the state court, it's quite clear that the district court conducted a thorough and complete examination of the entire record. Judge Stiven's supplemental report and recommendation is 30 pages long. Judge Stiven, his report and recommendation, after objections from appellant, was fully adopted by Judge Miller. Those reasonable evaluations of the record established very importantly, very clearly, that nothing undermines the confidence in the outcome in this case. That occurs because of four significant reasons. Even if you accept that Innis, and it's not established that the Innis theory is recognized in the medical community, that it would have been admitted at trial, that anyone knew about it in 1991 or 1992 when this trial occurred, but even if you accept that someone would have testified to that in the trial in 1992, the Innis theory fails to undermine the confidence in the Innis theory as both district court judge and the magistrate judge, now district court judge, recognized. There was clear evidence of fresh injury, at least two episodes. Not a chronic long-term brain bleed, but fresh injury, including a massive injury that occurred on August 10th, just a couple of hours before admission. Dr. Alexander testified about that quite clearly. There was evidence of clear characteristic evidence of child abuse. Dr. Saskia Hilton, a pediatric radiologist, testified that she examined an x-ray from August, I believe from August 11th, but either the 7th or the 10th admission a day after that, and she saw clear evidence of a healing rib fracture that was two to three weeks old. Not the fracture callus about which Dr. Innis opines, and the unclear evidence about whether there was a fracture callus or some indication of injury right after birth. Dr. Hilton says two to three weeks before admission, and it wasn't just a rib fracture. It was the characteristic rib fracture for child abuse. This movement, squeezing the child about the thorax hard as a predicate to shaking the baby and causing the brain injury. There was other evidence, clear evidence of injury to the baby's tongue, the frenulum. That injury is not accidental, was never explained, was clear evidence of abuse, and very importantly, was the subject of the defendant's lie when he was first asked about it. When the child was taken on August 7th, the first admission, or the admission on August 7th, and was taken to the hospital, he said that happened at Coronado Hospital. Dr. Mathias did it when she inserted an object into the mouth, and Dr. Mathias said that never happened. He was asked, he was caught, and he lied. Beyond that, the Dr. Innis testimony does not explain in any way the fact that we had a defendant who was with the child for the acute injury on August 10th. We have a father who was violent and who was dishonest. Judge Stiven said this was compelling evidence. It is clear evidence. There is nothing in the Innis testimony that changes that. Innis's declaration does only one thing. It provides an alternative explanation for a brain bleed that begins at or near the time of birth, but it doesn't explain in any way the acute and massive brain bleeds that occurred on two or three separate incidents just shortly before this child died in August. So there can be no ineffective assistance of counsel. Beyond that, it is a complete mystery what records now the defense believes were not available to defense counsel or what records were not presented to experts. A complete mystery. But what we do know, well, we can't know that. And as you can see from Judge Stiven's supplemental report and recommendation, he just can't conclude it. I would say that that establishes clearly that the, that appellant has not met the burden of establishing deficient counsel performance. We are invited simply to speculate. And although there is some, although there are some questions about the number of documents that are available, Dr. Innis's testimony or Dr. Innis's declaration relies on 35 pages. And it simply is never stated that other physicians didn't have those documents at the time of trial, those 35 pages. But we don't know that to be, we simply cannot know that at this time. Beyond that, this is a habeas corpus matter. And the question is whether the case was based on an unreasonable determination of the facts contrary to or an unreasonable application of Federal law or was based on an unreasonable determination of the facts. And appellant doesn't even attempt to show that what the State Supreme Court did was unreasonable in terms of law or was based on an unreasonable determination of the facts. Of course, at this point, we've got new, new evidence. Obviously, your position is it wasn't exhausted. And so the question, isn't it, after an independent review, whether the determination is contrary to clearly established Supreme Court law? Pardon me. And of course, Judge Reimer, that, that is precisely correct. But as Maddox shows, as Lambert shows, to make that determination, you must first engage in an intrinsic review of the record, of the development of the record in the State Court. And there's no challenge to that. There's simply no suggestion that the State Court should have found the innest material. It's, it's, it's just not there. Now, one footnote. Appellant says that he only was able to obtain some documents after he exercised the use of the subpoena in 2003. I'm relatively new to this case. And I, relatively new. I was not involved until after the district court decision. But what, what is quite clear is that there was no need for a subpoena to get those records in 1999 and in 2002. First, based on a, based on an authorization by Mr. Jimenez himself to appellate counsel. And then also, as shown by a declaration from the new Mrs. Jimenez, Diana Jimenez, that all they had to do was ask the hospital to provide records. And they did. And my examination of the record doesn't show that the district court ever granted discovery authority to Mr. Jimenez. So I'm not sure, I'm not saying that there wasn't a subpoena. I'm just not aware of what, what the source of that was. But what's important is that those records were available all the time simply by asking the hospital. So, so there's no problem with the fact finding in the case. The state court determination is based on the record before it. And that, that determination is completely reasonable because the only claim there was that the Lewis report had not been provided. And as a, and as Judge Stiven states quite clearly, the Lewis report was in the possession of the defense. Now, I, I think that's a finding of fact. Although I, it's not stated quite that clearly in the supplemental report and recommendation. I think that's a finding of fact that is not shown to be clear error by any means. With regards to being able to get the record simply by asking for them, I'd refer the court to the excerpts of record at page 147 and 143 that show that the defense didn't have any difficulty getting those records from the hospital just by asking for them. This was not a close case. And Dr. Innes, even if he, even if this late found doctor in the middle of Australia who hasn't been practicing for years is believable. He, he provides no, no real CV and there's not even a, there isn't even any, there isn't even a sort of identification in his report. We have no way to assess whether this is valuable or not. But even if it, and there's no way to assess whether it was available to anyone in 1992. But what we do know is that at least six experts examined the records. Three defense experts and at least three prosecution experts examined the records of the health care of this child and not one of them in 1992 thought there was something missing. There simply is no indication that things were missing in 1992. And well, I, I think I've covered it and I thank you for your attention. Thank you, Mr. Vienna and Ms. D'Angelo. Lots of things. When you talk about having all the records, the parents have the They are not privy to the entire medical record. We found this out by trying to request the records back in 98, receiving 111 pages from Children's Hospital under subpoena. When we finally had it, when the government answered, we received 363 pages from Children's Hospital. These showed that the child had transfusions. None of the prosecution's experts had seen those. They could reach their unified opinion as to what was going on, but they hadn't seen the entire medical record. I'm reminded of the blind men and the elephant, where each put his hand on a different part of the elephant and was asked to say what it was. Each of them was partly right. Shaken Baby was partly right for what they saw, but all completely wrong. None of them saw the entire medical picture. The only Dr. Innes, and he is the one and only hematologist. This is a bleeding case. The child had bleeding problems from birth. She had a traumatic tap taken immediately after she was born. She had hepatitis A infection. This was a sick baby. She had unexplained anemia all the way through. This is not a simple case of, okay, all of a sudden someone's going to shake her. She went to the hospital after being fed by her mother, cared for exclusively by her mother with epilepsy. This is a child who was diagnosed as having had epilepsy. The attorney did not bring out this testimony at court. He claimed, he declared that he had talked this over with his experts, and they decided not to, that this wasn't a good idea. Dr. Tisnoto said in declaration, epilepsy is one of the most grave, urgent, critical symptoms of this bleeding in the brain. If they didn't bring this out at trial, even without Dr. Innes' diagnosis, they could have punched holes in this shaken baby. They didn't talk about the child being in the care only of her mother, and the child had seizures. This was a child who had been hospitalized three different times. And a medical records case, no one saw him shake a baby. And his attorney did not subpoena the case. Thank you. I think we understand the vigor of your argument, and we appreciate the presentation by both counsel, and the matter just argued will be submitted well next to your argument in Ossikowski.
judges: Browning, Magill, Rymer